

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV–15–706

| | |
|---|---|
| | **Opinion Delivered** MARCH 2, 2016 |
| JOSHUA KILGORE<br>APPELLANT | APPEAL FROM THE PULASKI<br>COUNTY CIRCUIT COURT,<br>SECOND DIVISION |
| V. | [NO. 60CV–15–469] |
| ROBERT MULLENAX AND SENIOR<br>DENTAL CARE, LLC<br>APPELLEES | HONORABLE CHRISTOPHER CHARLES<br>PIAZZA, JUDGE |
| | AFFIRMED |

## DAVID M. GLOVER, Judge

Joshua Kilgore appeals from the trial court's May 28, 2015 order confirming the arbitrator's award (combined interim and final awards) in favor of Robert Mullenax and Senior Dental Care, LLC. He contends the trial court erred in doing so because 1) Arkansas public policy forbids an arbitrator from entering an award against a party who communicates information about fraudulent insurance acts to the Arkansas Insurance Department where the speaker reasonably believes the information to be true, and 2) the arbitrator lacked jurisdiction under the Federal Arbitration Act (FAA). We affirm.

*Undisputed Facts*

In its interim award, the arbitrator set forth the basic facts of this case, which are not in dispute. We will further condense them here. Robert Mullenax, an insurance agent and business owner, formed Senior Dental Care, LLC (SDC) with Dr. Chad Matone, an

Arkansas dentist.  SDC operates a dental-management company, which administers dental practices that provide dental care to residents of skilled nursing facilities.

Joshua Kilgore, a businessman and licensed nursing-home administrator, approached Mullenax in late 2010 or early 2011 concerning the acquisition of an interest in SDC. Kilgore was familiar with the SDC program through his work as an administrator. On January 1, 2012, Kilgore, Mullenax, Matone, and SDC executed a purchase-and-sale agreement by which Kilgore was able to purchase membership units in SDC. Section 7 of the purchase-and-sale agreement provided in part:

a.  In further consideration of the transfer to Buyer [Kilgore], buyer agrees that he will not Directly or Indirectly, at any time during which he has an ownership interest in the Company [SDC] and for two (2) years thereafter

  i.  form or be employed by, act as an agent for, or otherwise participate in any sole proprietorship, venture, corporation, partnership, or other entity that is in the business of providing dental care to residents of skilled nursing facilities or assisted living facilities within the state of Arkansas;

  ii.  solicit work from or provide such dental services to a Customer of the Company or seek to cause any Customer to refrain, in any respect, from acquiring services from or through the Company[.]

Although Matone subsequently left SDC, an addendum to the purchase-and-sale agreement was executed, leaving the noncompete provisions of the agreement in full force and effect between the remaining owners, Mullenax and Kilgore.

A conflict subsequently developed between Mullenax and Kilgore, resulting in the May 2013 execution of a confidential-settlement agreement and full release (settlement agreement). The parties thereby agreed that they had continuing obligations under the purchase-and-sale agreement and that those continuing obligations included the

noncompete provisions. They further agreed that the two-year time period for the noncompete provisions would begin on April 1, 2013, and end on April 1, 2015.

The settlement agreement provided in part

> Kilgore will not disclose, communicate, make public or publicize in any manner any disparaging or defamatory comments about Mullenax or the Companies [Senior Dental Care, LLC, ConceptBLU, LLC, and VitalSound, LLC] or any statements that impugn, disparage, discredit, or detract from Mullenax or the Companies.
>
> . . . .
>
> Kilgore further agrees to terminate all contractual obligations that he or any company controlled by him had with the Companies, including, but not limited to, the Kilgore Consulting Group, LLC ("KCG") Consulting Services Agreement with SDC dated November 1, 2012.

Both the purchase-and-sale and the confidential-settlement agreements provided that disputes were to be settled by arbitration under the rules of the American Arbitration Association (AAA).

On June 1, 2013, Kilgore acquired an ownership interest in Care Services Management, LLC (CSM). CSM markets the dental services of Marquis Mobile Dental Services, LLC (MMDS) in the State of Arkansas and elsewhere. It also markets other medical services. CSM's offices are located in the State of Tennessee. CSM and MMDS operate out of the same location in Tennessee. MMDS and SDC are competitors. CSM uses marketing materials in Arkansas that contain a separate page labeled "Dental Services," which provides in part:

> CSM is able to offer Dental services to all of our clients through the use of two different leaders in on site Dental services, providing one of the only truly legal means of providing dental care in the Long Term Care setting.

SDC's vice president testified that after Kilgore withdrew from SDC, nineteen facilities sent termination notices to either Senior Care Solutions or Senior Works, which are companies affiliated with the SDC dental program.

On January 16, 2014, Mullenax and SDC filed a demand for arbitration with the AAA. Kilgore subsequently called the Arkansas Insurance Department (Insurance Department) and alleged possible fraudulent insurance acts committed by Mullenax and SDC. The Insurance Department thereafter initiated an investigation concerning Mullenax and the SDC program. Apparently, nothing of consequence resulted from the investigation, but Mullenax testified that he and SDC spent $7,105 in attorney's fees and related expenses as a result of the investigation.

Mullenax testified he found it strange that shortly after Kilgore left, nineteen facilities terminated their relationships with SDC-affiliated companies. He acknowledged, however, he had no evidence that anyone left SDC because of any defamation.

Kilgore explained his motivation for calling the Insurance Department was to "see if [he] could use a particular situation as a defense." He further testified,

> I wanted her [an attorney with the Insurance Department] to know that my call was about looking at a couple of defensible angles because I felt like if I could prove that some of the things that he was doing were not allowed under the Arkansas insurance laws, then it would—it would essentially wipe out— . . . any other—any claim that he would have under the noncompete. And at that point in time, that appeared to be the biggest you know situation there, so . . . .

Kilgore then became unhappy with the progress of the Insurance Department's investigation, and he talked to Senator Percy Malone about it. Senator Malone contacted the Insurance Department and reported Kilgore had some information that might interest them.

Also, shortly after terminating his relationship with Mullenax and SDC, Kilgore asked Dr. Richard Wike, who was providing optometry services for the Mullenax program, whether "he was still doing the illegal kickback deal with Bob Mullenax." Dr. Wike had been serving Kilgore's nursing facilities until Kilgore terminated his relationship with Mullenax and SDC.

At least two persons testified that Kilgore approached them about his new dental program and stated it was better than that offered by Mullenax, offering one of the persons the brochure that stated CSM provided one of the "only truly legal" means of providing dental care in long-term care (LTC) settings. However, all of the witnesses who testified on the issue stated they did not abandon SDC services because of Kilgore.

Kilgore challenges the arbitrator's exercise of jurisdiction under the Federal Arbitration Act as his second point of appeal. For ease of discussion, we address it first and find no error.

*Arbitrator's Jurisdiction*

The issue of whether the arbitrator's jurisdiction should be exercised pursuant either to the federal or to the state arbitration act was presented to the arbitrator, and he concluded the FAA governed. The trial court confirmed the arbitration award, finding that "the Arbitration Award of the Arbitrator was proper and that there is no basis for vacating, modifying, or correcting the Arbitration Award," and specifically noting in his posthearing rulings that the arbitrator had fully discussed the jurisdiction issue.

Kilgore contends the arbitrator erred in deciding this case was governed by the FAA because the federal act requires a contract evidencing a transaction in commerce, which he

argues did not exist here. We find no reason to vacate the award based on the arbitrator's exercise of jurisdiction under the federal act.

The arbitration clauses of both agreements that were at issue in the underlying arbitration (purchase-and-sale agreement and confidential-settlement agreement) provided that disputes were to be settled by arbitration "in accordance with the rules . . .  of" or "under the auspices of" the AAA. As explained by the arbitrator, Rule 7 of the Rules of the AAA provides that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."

In addressing the jurisdictional questions, the arbitrator explained that the FAA applied to all contracts "evidencing a transaction involving commerce." In addressing the basic question of "What is a transaction involving commerce?" the arbitrator cited a 1995 United States Supreme Court case, *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, and explained the Supreme Court concluded that an expansive interpretation of the FAA was correct, viewing "commerce" broadly, observing that the words "involving commerce" are broader than the more commonly used words "in commerce," and holding that use of the term "involving commerce" in the FAA "signals an intent to exercise Congress' commerce power to the full."  The arbitrator further explained that the Court in *Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52 (2003), addressed the question as to whether the contracts must involve commerce or whether they simply must be the types of contracts in general that involve commerce and concluded that "the proper focus of the inquiry is not

upon the individual transaction, but upon 'consideration of the 'general practice' those transactions represent."

With that backdrop, the arbitrator explained,

> In the arbitration at hand, it is noted that the parties have agreed in the Purchase and Sale Agreement to arbitrate "[a]ny dispute or controversy between the parties arising out of or otherwise relating to this Agreement," and in the Confidential Settlement Agreement and Full Release to arbitrate "any dispute arising under this Agreement." Although the covenant–not–to–compete covers only activity in Arkansas, Claimant has presented evidence that Kilgore became an owner of a Tennessee business that competes with SDC and Mullenax's affiliated dental service companies in Arkansas. Further, the dental services of both SDC and its Tennessee competitor receive monies from federal Medicare and Medicaid, which are "certainly subject to Congress' power to regulate." Medical supplies and equipment used in Arkansas by both the Arkansas and Tennessee competitors are purchased and transported in interstate commerce. Because the agreements and their prohibited activities "involve interstate commerce" and are the type of activities that usually "involve interstate commerce," the FAA applies to this arbitration and both the contract and tort claims shall be addressed and decided in this arbitration.

Under the AAA rules, which the parties designated as applicable under both agreements, the arbitrator decides jurisdictional issues. The trial court specifically noted in its ruling at the conclusion of the hearing confirming the arbitrator's award that the arbitrator had fully discussed the jurisdiction issue. We agree. The arbitrator fully discussed the issue, cited applicable cases, explained the concept of interstate commerce under those cases, described the contracts, and concluded that the nature of the contracts involved here brought them within interstate commerce. We are not convinced by Kilgore's argument that the arbitrator lacked jurisdiction under the FAA and that the arbitration award should be vacated on that basis.

*Public Policy*

Kilgore's remaining point of appeal contends that the arbitration award should be vacated because it violates Arkansas public policy. He asserts the arbitrator exceeded his powers because Arkansas Code Annotated section 23-60-111 (Repl. 2012) sets forth Arkansas public policy that "no civil cause of action of any nature shall arise against the person for supplying any information" to the Insurance Department relating to suspected fraudulent insurance acts. He argues this statute forbids an arbitrator from entering an award against a party who communicates information about fraudulent insurance acts to the Arkansas Insurance Department where the speaker reasonably believes the information to be true. Again, we find no basis for vacating the arbitration award.

Because we have rejected Kilgore's challenge to the arbitrator's exercise of jurisdiction under the FAA, we examine his public-policy challenge under the grounds for vacating arbitration awards set forth in 9 U.S.C. § 10:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

The Eighth Circuit Court of Appeals, while recognizing that an arbitrator's broad authority is not unlimited, outlined the general parameters employed in reviewing

arbitration decisions in *Medicine Shoppe International, Inc. v. Turner Investments, Inc.*, 614 F.3d 485, 488 (2010):

> "When reviewing a district court's order confirming an arbitration award, we review de novo questions of law, but we accept the district court's factual findings unless clearly erroneous." Although we review de novo the district court's legal conclusions, we provide "an extraordinary level of deference" to the underlying arbitration award. Courts have no authority to reconsider the merits of an arbitration award, even when the parties allege that the award rests on factual errors or on a misinterpretation of the underlying contract. "The bottom line is we will confirm the arbitrator's award even if we are convinced that the arbitrator committed serious error, so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority."

(Citations omitted.) The *Medicine Shoppe* opinion further explains that, prior to the United States Supreme Court decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008), a court could vacate arbitration awards on grounds other than those listed in the FAA. In *Hall*, however, the Court held that "'the text [of the FAA] compels a reading of the §§ 10 and 11 categories as exclusive.'" *Medicine Shoppe*, 614 F.3d at 488.

We wrestled with Kilgore's public-policy argument, but we concluded Arkansas Code Annotated section 23-60-111 and the facts presented in this case do not provide the type of basis for vacatur envisioned by 9 U.S.C. § 10(4). The arbitrator clearly had the "power" to address the issue before him, i.e., whether Kilgore violated the nondisparagement clause of the Settlement Agreement, and he fully explained why he concluded that Kilgore did violate that clause. In discussing the specific disparagement findings related to Kilgore's contact with the Insurance Department, the arbitrator was careful to note that Kilgore's "primary motivation was not protecting the interest of the public but to gain an advantage in the arbitration that SDC and Mullenax had filed against him, thinking that to discredit or disparage Mullenax might give him an advantage and result

in the dismissal of the arbitration." Given the arbitrator's broad authority, the extraordinary level of deference we provide to the underlying arbitration award, our limited judicial review of arbitration decisions under 9 U.S.C. section 10, and Kilgore's acknowledgment that his motivation for contacting the Insurance Department was strategic in nature for his own benefit—not out of a sense of public interest—we have concluded he has not demonstrated that the arbitrator exceeded his power to any extent necessary to vacate the arbitration award pursuant to 9 U.S.C. section 10(4).

Affirmed.

ABRAMSON and HARRISON, JJ., agree.

*Smith, Cohen & Horan, PLC*, by: *Matthew T. Horan* and *Stephen C. Smith*, for appellant.

*Gill Ragon Owen, P.A.*, by: *Dylan H. Potts* and *Danielle M. Whitehouse*, for appellees.